**The STATE of Texas, Appellant,**

**v.**

**Walter C. CAVE et al., Appellees.**

**No. 11616.**

Court of Civil Appeals of Texas.

Austin.

July 24, 1968.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Exe. Asst. Atty. Gen., Houghton Brownlee, Scott Garrison, Asst. Attys. Gen., Austin, for appellant.

Ed Idar, Jr., San Angelo, for appellees.

O'QUINN, Justice.

This is an appeal by the condemnor from a judgment in the county court of Tom Green County in an eminent domain proceeding.

The State of Texas, acting through the Attorney General for the Board of Regents of State Senior Colleges, brought the original action in July, 1967, to acquire for Angelo State College at San Angelo certain residential property owned by Walter C. Cave and his wife, Juanita Cave. The proposed acquisition was shown to be part of a four block area of land needed for expansion of the Angelo State College campus.

Special Commissioners awarded damages in the sum of $17,500 for the Cave property, consisting of two and one-half lots (125 by 150 feet) on which were located the Cave home and a smaller rent house next door. Deposit of the award was made into the registry of the court on September 28, 1967.

The Caves filed written objections to the award on October 6, 1967. The cause was tried in county court before a jury beginning November 27, 1967. The trial court entered judgment based on the jury's verdict on December 11 finding the cash market value of the Cave property to be $22,750.

The State filed motion for new trial on December 18 based upon eight counts of jury misconduct and one count related to

improper argument of counsel. The trial court held a hearing at which five of the six members of the jury testified on January 17, 1968.

The trial court entered an order on January 26, 1968, overruling the State's motion for new trial. The State has appealed from the denial by the trial court of the motion for new trial.

The State grounds its appeal on nine points of error. The first point is that the trial court erred in overruling the State's motion *in limine* to restrict the Caves in introduction of evidence as to any measures of damages other than value of the property taken. The last point, number nine, pertains to arguments of counsel for the Caves which the State contends were improper. All other points, numbered two through eight, relate to jury misconduct.

We overrule all points of error and affirm the judgment of the trial court.

The State's motion *in limine* was two-pronged. In their objections to the award of the commissioners, the Caves had set up, in addition to damages for the taking of their property, a ground involving trespass. The first prong of the motion *in limine* was levelled at this claim, which the Caves abandoned before the trial began. The second prong of the State's motion requested the trial court to "instruct defendant herein not to present or allude to evidence relating to remote, conjectural or speculation uses of subject property."

The trial court overruled the motion *in limine*. The trial proceeded on the sole issue of market value of the Cave property as of September 28, 1967.

The State in its brief sets out nine examples to "show how continued references were made by the witnesses or attorney * * * to elicit sympathy, resentment, bias or prejudice and depart from the concept of market value of subject property. * * *" The record shows that the State made no objection to eight of the nine "examples." Objection was timely made to reference by Witness Tidwell that, "At the time I went out and measured the structure, there was heavy equipment working out there." The trial court sustained the objection and instructed the jury to disregard the statement.

■ Even if the trial court had been in error in overruling the motion *in limine,* the error standing alone would not be reversible error. Before the court's action in overruling the motion could constitute reversible error, it must be shown that the matter sought to be suppressed arose during the trial and that the State, having originally urged the motion, made timely objection in the trial. St. Paul Fire and Marine Insurance Company v. Escalera, 385 S.W. 2d 477 (Tex.Civ.App., San Antonio, writ ref. n. r. e.); Hardware Dealers Mutual Fire Insurance Company v. King, 408 S.W. 2d 790 (Tex.Civ.App., Austin, rev. on other grounds Tex., 426 S.W.2d 215); Export Insurance Company v. Johnson, 401 S.W. 2d 324 (Tex.Civ.App., Amarillo, writ ref. n. r. e.); Hartford Accident and Indemnity Company v. McCardell, 369 S.W.2d 331 (Tex.1963), discussing the rule of Bridges v. City of Richardson, 163 Tex. 292, 354 S.W.2d 366 (1962).

■ The trial court was not required to determine in advance of the trial the admissibility of the evidence the State described in its motion *in limine*. Transport Insurance Company v. Nunn, 375 S.W.2d 484 (Tex.Civ.App., Houston, writ ref. n. r. e.).

Points of error two through eight relating to conduct of the jury are based substantially upon the following claims of misconduct:

1) That Mrs. Broman told Mrs. Orsak that she had read a story in the newspaper giving the amount of the commissioners' award.

2) That Mr. Jones remarked to the jury that he had moved from El Paso to San Angelo and that it costs a lot of money

to move, which brought into the deliberations a non-compensable element of damages and brought sympathy for the Caves.

3) That some jurors discussed that the college had used wrong methods in acquiring property, showing that bias and prejudice played a part in deliberations.

4) That there was a discussion about Mrs. Cave not being able to drive, thereby bringing about sympathy and emotions to affect the deliberations.

5) That two jurors, Mrs. Broman and Mrs. Orsak, violated the court's instruction not to let bias, prejudice, sympathy, resentment or emotion play a part in deliberations.

As already indicated, five of the six jurors testified at the hearing on the State's motion for new trial. Four of the jurors testified that the jury reached a verdict within thirty minutes, two of them giving the time as fifteen or twenty minutes after the jury retired. After the decision was made that the Cave property was worth $22,750, the foreman wrote the figure down, signed the verdict, and placed the paper upside down on the table. All jurors, when asked about subsequent change in the verdict, testified that no change thereafter was made and that the verdict finally returned was the same agreed to initially.

The suggestion was made by one of the jurors that the jury should not return to the court room in a hurry. Mr. Jones testified that someone said, "We might as well set and get acquainted." Mr. Jones added, "Actually we were not even acquainted with each other." The jury finally made its report after being out of the court room about one hour and fifteen minutes.

It was the testimony of four jurors that discussions and remarks about which they were questioned at the hearing came only after the jury had agreed on value of the Cave property and after the foreman had

written it down. The fifth juror, Mrs. Cassles, agreed generally, but thought discussion of "hemming in of property owners by the college" took place before the value decision had been reached.

The complaint of the State that Mrs. Broman told Mrs. Orsak that she had read a newspaper story giving the amount of the commissioners' award is based on testimony from Mrs. Orsak that Mrs. Broman told her she read a story in the paper that mentioned $17,500 and Mrs. Orsak assumed the college had offered that amount for the Cave property.

Mrs. Broman testified that she read the newspaper story at home on the evening of the second day of trial. Next day after the jury retired at the close of the evidence, Mrs. Broman asked the lady sitting next to her if she had read the news story. Mrs. Broman insisted she did not relate any information contained in the article and said her remarks were made after the jury had reached a decision on the value of the Cave property. Both Mrs. Orsak and Mrs. Broman testified there was no discussion between them, as Mrs. Orsak had only replied that she did not see the story since she did not take the afternoon paper. Their remarks were between the two of them, not heard by other jurors.

The complaint that Mr. Jones told the jury that it cost a lot of money to move from El Paso to San Angelo is founded on a remark Mr. Jones admitted making, after the verdict had been reached, that it had cost him nearly $1,000 to make the move. No other juror remembered that Mr. Jones used that specific figure, just that it cost a lot to move, and there was no discussion or reply after the comment. Mr. Jones testified, "* * * we had arrived at a settlement, and the paper was already signed by the jury foreman, was laying on the table upside down, and I made the statement afterward. We were talking about different things."

The State's point that bias and prejudice were shown in the discussion among the jurors that the college had "used wrong methods in acquiring property" derives from testimony adduced without objection from two witnesses for the State. The testimony was that in April, 1966, the college obtained a "special permit" from the city imposing a restriction upon land within a specified area near the college which limited use of the land to "college purposes." The Cave property and the four-block area in which it was located were included in the restricted zone.

Mrs. Orsak testified that although she thought the special zoning put the property owners at a disadvantage, there was no discussion among the jurors as to whose fault this was. Mrs. Cassles testified that the jury discussed the hemming in of property owners by the college and mention was made of the injustice, but she herself did not think it unjust to the Caves.

The testimony concerning the restrictive zoning, which had been ordained by the city at the behest of the college, came from Sam Hesse, an expert witness called by the State, who was chairman of the city planning commission in San Angelo, and from Hudson Russell, another expert witness for the State, who was also a member of the city planning commission.

Hesse appraised the Cave property at $12,750, and Russell appraised it at $12,075. Both witnesses appraised the Cave property for single-family residential use. Russell testified he considered this to be the highest and best use for the property. Hesse testified that he did not appraise the Cave property on the basis of its use for apartments, "Because of the zoning restrictions imposed upon the property."

There was testimony that within three to four blocks of the Cave property apartments had been erected on sites smaller or only slightly larger than the Cave land. Hesse testified that for appraisal purposes the nearby apartment sites " * * * would not be comparable because of the zoning

restrictions imposed upon the Cave property."

In the light of this testimony, the jury was at liberty to discuss the evidence, which was before the jury without objection having been made to its introduction. The State's witnesses, Hesse and Russell, gave the lowest appraisals of the Cave property brought into evidence. Hesse twice declined to compare the Cave property with known apartment sites in the same neighborhood because of the zoning restriction invoked by the college. Russell admitted that under city zoning regulations for apartments, the Cave property if so zoned could lawfully accommodate fifteen living units.

It seems obvious from the evidence that the Cave property, in comparison to other property in the vicinity but not within the "special permit" zone, was at a disadvantage. The jury did not lay the blame for this upon either party and did not find fault with either the condemnees or the condemnor.

The State purports to brief its point with reference to "wrong methods in acquiring property" with the point that the jury discussed "about Mrs. Cave not being able to drive." The latter point we fail to find treated in the brief in any manner under the assigned error. We regard the point as trivial, even if briefed. Mrs. Cave was asked whether she could drive and she replied that she did not drive, that she was "two blocks of the church." This was the extent of her testimony about driving, and it went into the evidence without objection to the question or to the answer.

It was not unexpected that with the jurors having heard this testimony, one of them would observe, as one of them did, that, " * * * it was convenient where she was, where they lived, and, then, she could not drive." Mrs. Broman testified that the remark was made but that it came, "After we had already reached a decision of the price." Mrs. Cassles testified there was

not any extended discussion on the point. "I do remember that," she said, " * * * it wasn't carried to where it was sympathizing with them," Mrs. Cassles added.

The remaining points of error on jury misconduct are to the effect that Mrs. Broman and Mrs. Orsak "violated the court's instruction not to let bias, prejudice, sympathy, resentment or emotion play a part in deliberations."

The record shows that Mrs. Broman mentioned to Mrs. Orsak that she had read an article in the paper about the trial, and Mrs. Orsak replied that she had not seen it, that she did not take the afternoon paper. If a figure was mentioned, it was not identified as the award made by the commissioners. Mrs. Orsak assumed that any figure mentioned was an offer the college made to the Caves. Apparently Mrs. Broman alone knew the amount of the commissioners' award. Mrs. Orsak said that the brief exchange between her and Mrs. Broman was not heard by the other jurors. No juror testified to hearing any part of the conversation. Mrs. Orsak said the exchange happened after the jury had reached its verdict.

Although it was not proper for Mrs. Broman to read the news story and later mention the matters she read to another juror, we are unable to find in this brief conversation evidence to support the State's charge that Mrs. Broman "let bias, prejudice, sympathy, resentment and emotion play a part in deliberations." The State expressly does not challenge Mrs. Broman's "service as a juror." Certainly, Mrs. Orsak, who only listened and closed the exchange by saying in effect she knew nothing about the subject, cannot be made a culpable party to Mrs. Broman's impropriety.

By overruling the State's motion for new trial, after hearing the testimony from five of the six jurors, the trial court impliedly found that misconduct of the jury did not occur. In passing on the finding of the trial court, we will reverse the court's refusal to grant a new trial only where a clear abuse of discretion is shown. State v. Wair, 172 Tex. 69, 351 S.W.2d 878 (1961).

The only deportment of the jurors suggesting consideration by them of matters not within the evidence were (1) the remark Mrs. Broman made to Mrs. Orsak about the news story she had read and (2) the casual comment of Mr. Jones that it cost a lot for him to move from El Paso to San Angelo. Four of the jurors did not hear Mrs. Broman, and there was no discussion or comment in response to Mr. Jones' remark. Both remarks were made after the verdict had been reached. Neither comment therefore could have caused any juror to vote differently. Improper conduct occurring after the verdict, with a clear showing that the offending remarks did not have an improper influence on any juror, is not reasonably calculated to affect the verdict and is not reversible error. City of Amarillo v. Huddleston, 137 Tex. 226, 152 S.W.2d 1088 (1941); Navar v. State, 344 S.W.2d 188 (Tex.Civ.App., El Paso, no writ).

All other discussions by the jury assigned by the State as misconduct pertained to matters properly before the jury as evidence.

With one exception, all of the jurors who testified as to when these discussions occurred, said it was after the verdict had been agreed upon. Mrs. Cassles thought the talk about the college and its special permit was before the verdict, but she did not think the hemming in was an injustice. There is no showing any juror was influenced by any of the discussions to which the State objects, or that any juror would have voted for a different verdict but for the discussions.

We find that the discussions and statements did not amount to material misconduct, and the trial court did not abuse its discretion in making such implicit finding in overruling the motion for new trial.

The State having asserted misconduct of the jury had the burden of showing,

not only that the misconduct occurred, but that the misconduct probably resulted in injury. City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259 (1944); Rules 327, 434, 503, Texas Rules of Civil Procedure.

We have carefully examined the entire record, including the statement of facts, the testimony of the jurors at the hearing on motion for new trial, the transcript, and the arguments of counsel to the jury. We have reached the conclusion that the State has failed to discharge its burden to demonstrate affirmatively that probable harm resulted from the statements made in the jury room of which the State complains. In the absence of showing that the statements had any influence on the verdict, reversible error is not established. Kittrell v. State, 382 S.W.2d 273 (Tex.Civ.App., Dallas, writ ref. n. r. e.), and cases cited 382 S.W.2d 273, 276, col. 2.

On the question of market value, the State offered two expert witnesses, Hesse and Russell, who testified that they had appraised the Cave property at the request of the college. Hesse said the property was worth $12,750 and Russell appraised it at $12,075.

The Caves introduced evidence of market value through Raymond E. Tidwell and Lester E. Horner, experienced real estate men, who put a value of $24,000 (Tidwell) and "around $23,000 or $24,000, at least" (Horner) on the Cave property. As already noted, the award of the commissioners was $17,500. The jury found a value of $22,750.

There was extensive testimony from the witnesses, particularly from Hesse and Russell, as to the sale price of other residential property in San Angelo, some of it in the immediate vicinity of the Cave property. It was shown, for example, that the Coward property, located four blocks from the Caves and consisting of four lots, sold for $24,500. The four College View lots, one block from the Caves, sold for $24,500. One Ricci bought three lots and two houses, located two blocks from the Caves, for $26,500. There was evidence of sales prices on the Thunderbird site, the Horn apartments site, and the Delmar apartments site and others, all within a few blocks of the Cave property.

On cross examination Hudson Russell, who had appraised the Cave lots and houses (125 by 150 feet) at $12,075, admitted that a loan company in which he was an officer and director, had loaned Ricci $22,800 on three lots (160 by 150 feet) located two blocks from the Cave property.

Testimony relating to sales of other property in the vicinity of the Cave property, as well as in other parts of San Angelo, was introduced without objection from the State. The State made no objection to introduction of the testimony that the loan company, in which Russell was an officer, had appraised the Ricci property, only half a lot larger than the Cave site and with the same number of houses on it, and made a loan on the property for $22,800.

It was undisputed that the Cave home was of masonry construction, with imported tile flooring, with a frame rent house next door, the two houses being situated on two and one half lots. A witness for the Caves testified that two lots and a frame house, located two or three blocks from the Cave place, sold for $19,000. The State's witness, Hesse, testified to three sales as follows: (1) Frame house, one lot, sold for $13,000, which was higher than his appraisal of $12,750 on the Cave property with two houses and two and one half lots; (2) frame house, one lot, 22 blocks from the Cave property, sold for $12,500, which was only $250 less than the Hesse appraisal, and was $425 more than the Russell appraisal, on the Cave lots and houses; (3) brick veneer, one lot, 11 blocks from Caves, sold in 1966 for $15,000, which was $2,925 more than Russell's appraisal and $2,250 more than the Hesse appraisal of the Cave property.

■ The finding of the jury that the Cave houses and lots had a cash market value of $22,750 was $1,250 below the high-

est valuation placed on the property by two witnesses for the Caves. The jury's valuation was $50 less than the amount that the State's witness, Russell, testified was loaned on comparable property in the same neighborhood with the Cave houses and lots. From a review of the facts we are not persuaded that the jury was prejudiced against the college or the State, or that the statements the State complains of had any influence on the jury's verdict.

Under its ninth and final point of error, the State complains that a new trial should have been granted because counsel for the Caves "made improper argument to the jury, predicating his appeal upon emotion, bias, prejudice and sympathy and that at least some of the jurors recalled that this improper material was discussed in deliberations."

In its brief the State cites fourteen examples of argument claimed to be improper.

Careful review of the record discloses that the State made no objection at any time to any of the fourteen remarks of counsel now pointed out by the State. Nor did the State move for a mistrial. In its motion for new trial the State made no mention of any of the first thirteen examples of argument cited in the brief as improper.

The only argument complained of in the motion for new trial was the fourteenth example. Counsel for the Caves ended his closing argument to the jury with the words, " * * * and I would hazard, as an attorney, to tell you that if you rendered a verdict of anywhere close to the figure of $23,-000 and $24,000, you will sleep well tonight. Thank you."

The figures suggested by counsel in his argument coincided with the market value placed on the Cave property by two witnesses, Tidwell and Horner, called by the condemnees.

Mrs. Cassles was the only juror who testified regarding mention in the jury room that the jurors could "sleep well tonight," a reference to counsel's statement.

When asked about the remark, Mrs. Cassles said, "Oh, yes, we did say that, but that was after we were through. We had already come to the amount. We had arrived at the amount, and we said, 'Well I guess we can sleep well; it is close to the amount.' But that was just a joke. It was after everything was said and signed."

Questioned further, Mrs. Cassles said, "Well, we just laughed it off. It was no big statement."

When asked if more than one juror mentioned "sleeping well," Mrs. Cassles replied, "No. I don't remember who said it. * * * To my best recollection, it happened after we had agreed on a price, because I could have said it, myself, as far as that goes. I don't remember. I don't remember who said it." Mrs. Cassles added, " * * * what I am saying is that this was * * * right before we came down. * * * "

This was the only testimony before the trial court relevant to the State's complaint that counsel's remark about the jury sleeping well was an appeal based on "emotion, bias, prejudice and sympathy." It is clear from the testimony that there was no discussion among the jurors, that only one juror made the remark, that the jurors laughed it off as a joke, that they shortly afterwards returned to the jury room, and that the remark was made after a verdict had been reached and after the foreman had signed it.

▆ Viewing the record as a whole, we conclude that none of the arguments of counsel resulted in harm to the State. Taken in the aggregate, the arguments we are satisfied were not reasonably calculated to cause the jury to render an improper verdict. Each of the arguments was clearly of the type that any harm that might have been done could have been corrected by timely objection and request for instruction for the jury to disregard the argument. In the absence of objection, an argument that could be cured properly by objection of counsel and instructions from the court

to the jury is not reversible error. Turner v. Turner, 385 S.W.2d 230 (Tex.1964).

The State having failed to object to any of the fourteen arguments when made, and having brought only one of the fourteen to the trial court's attention in motion for new trial, it is now too late to afford the opportunity to erase erroneous impressions, if any there were, that the jury received from the arguments. Unless an argument is patently improper, and is of such harmful nature that an instruction could not relieve its prejudicial effect upon the jury, reversal of the cause should not result. Newspapers, Inc. v. Love, 367 S.W. 2d 185 (Tex.Civ.App., Austin, rev. on other grounds Tex., 380 S.W.2d 582, 592, col. 2).

All points of error presented by the State on appeal are overruled. We find that the trial court correctly overruled the State's motion for new trial.

The judgment of the trial court is therefore affirmed.

Affirmed.